627 So.2d 1373 (1993)
STATE of Louisiana
v.
Nathaniel Robert CODE, Jr.
No. 91-KA-0998.
Supreme Court of Louisiana.
November 29, 1993.
Rehearing Denied January 6, 1994.
*1375 Richard P. Ieyoub, Atty. Gen., New Orleans, Paul J. Carmouche, Dist. Atty., Rebecca I. Bush, Asst. Dist. Atty., Catherine M. Estopinal, Tommy J. Johnson, Scott Crichton, Shreveport, for applicant.
John M. Lawrence, Indigent Defenders Office, for respondent.
WATSON, Justice.[1]
A Caddo Parish grand jury indicted Nathaniel Robert Code, Jr. on five counts of first degree murder. The indictment charged Code with the August 31, 1984, first degree murder of Deborah Ann Ford (count one), the Ford homicide, and with the July 19, 1985, first degree murders of Billy Joe Harris, Jerry Culbert, Carlitha Culbert and Vivian Chaney (counts two-five), the Chaney homicides. Prior to trial, this court severed count one, the Ford homicide. State v. Code, 535 So.2d 736 (La.1989). The state amended the indictment to charge Code with the Chaney homicides as counts one-four. In a separate indictment, Code was charged with the August 5, 1987, first degree murders of William T. Code, Joe Robinson and Eric Williams.
A jury found defendant Code guilty of first degree murder on all four counts of the Chaney homicides. The jury unanimously recommended the death sentence because of aggravating circumstances. The trial judge sentenced the defendant to death in accordance with the recommendation of the jury. This is the direct appeal of Code's conviction and sentence.
On appeal, Code relies on twenty-eight (28) assignments of error for the reversal of his conviction and sentence. In a capital case, this Court reviews all assignments of error and reviews the record for all possible error. See State v. Bay, 529 So.2d 845, 851 (La.1988). This opinion will treat the serious issues presented in Code's assignments of error regarding the use of other crimes evidence and an unassigned error involving opinion testimony about defendant's guilt. The opinion will also review the sentence. The defendant's remaining assignments involve legal issues governed by established principles of law and will be treated in an unpublished appendix, which will comprise part of the official record in this case. Finding no reversible error, we affirm Code's conviction and sentence.

FACTS

Ford Homicide: August 31, 1984
Deborah Ford was a 25-year-old single mother who lived at 315 East 74th Street in the Cedar Grove area of Shreveport with her two daughters, Nicki (then 9 years old) and Shawn (then 5 years old). The house they lived in was a small shotgun-style home. Because she had been burglarized, Ford had her father nail the back door shut and nail outside screens over all the windows.
On August 30, 1984, Ford took her daughters shopping for school clothes with Shawn's father, Danny Ware. They returned to 315 East 74th Street at approximately 9:30 p.m. While Danny Ware and Ford spoke outside, Nicki retrieved a stuffed animal to take to her grandmother's house, where the girls were going to spend the night. Leaving the house, Nicki noticed the bathroom window was open and closed it, placing a wooden stick vertically above the frame to keep it shut. The window had no lock other than a nailed screen. The stick could be dislodged by jiggling the window. Danny Ware drove the two girls to their grandmother's house.
Ford spoke briefly to her friends who lived across the street, Gussy Bell and her daughter, Juanita Parks, but returned home sometime before 10:00 p.m. Michael Bell, Gussy Bell's brother, visited Ford in her home until sometime after 11:00 p.m. Ford talked to a friend, Gregory Bell, three times between 8:00 p.m. and 12:30 a.m. Following her usual routine, she slept in the living room on the couch.
Sometime between 12:30 a.m. and 8:00 a.m. on August 31, 1984, an intruder pried the screen loose from the bathroom window and pulled it away from the house. The intruder raised the window and blocked it open with a *1376 piece of metal. In entering the house, the intruder left a smudged partial footprint in the bathtub immediately beneath the window and knocked paint debris and dirt into the bathroom and outside the window.
During the intruder's assault on Deborah Ford, furniture was knocked over and the couch cushions were disarranged. Ford bruised her hands defending herself.
The intruder had cut electrical cord from a box fan in the kitchen and used it to tie Ford's hands behind her back. The cord was anchored firmly around her left wrist and then looped around her right wrist, leaving a space in between, like a handcuff. The loose end was tied to the cord on the left wrist. Ford was gagged with clothing. While she was bound and gagged, the intruder stabbed Ford on the couch, then dragged her body to the floor where she was stabbed again. Ford was stabbed nine times in the chest, two times on the left side and seven times on the right side. Some of the wounds were deep enough to enter her lungs. Finally, moving her body to the middle of the room, the intruder cut her throat six times from right to left, cutting through her jugular vein, carotid artery, larynx and esophagus, almost to the spinal column. Despite her chest injuries, Ford was still alive when her throat was cut. She died from cumulative loss of blood. Forensic investigation established that the entire attack lasted from fifteen to thirty minutes.
Ford's body was discovered at 8:00 a.m. the next morning by her friend, Brenda Greggs. Greggs had walked over to use the telephone and discovered the front door ajar and the stereo playing. When her body was discovered, Ford was wearing only her nightgown turned inside out.
When police arrived at the Ford residence that morning, a small crowd gathered. Nathaniel Code, who lived in the neighborhood, was part of the crowd and talked to others about the murder.
Dr. George McCormick, the Caddo Parish Coroner, testified the crime was the work of one person and was clearly a signature crime. McCormick informed police the crime was the work of a serial killer who would kill again. McCormick noted four signature elements: the perpetrator's total control over the victim; the perpetrator's use of a knife to both stab and cut; the binding of the victim with an electrical cord; and the unique ligature used by the perpetrator. McCormick stated the killer was right-handed.
Investigation of the crime scene revealed three latent palm prints and a thumbprint on the bathroom window, window sill and inside wall below the window. The position of the recent prints was consistent with someone opening the window from the outside. All three palm prints and the thumbprint were later identified as matching those of Nathaniel Code.

Chaney Homicides: July 19, 1985
A few blocks from the Ford home in Shreveport, at 213 East 72nd Street, Vivian Chaney lived with her boyfriend, Billy Joe Harris. Also living in the house was Chaney's brother, Jerry Culbert, and her three daughters, Carlitha Culbert, Tomika Chaney and Marla Chaney. Vivian Chaney, Carlitha Culbert and Jerry Culbert were sight impaired. Tomika and Marla Chaney are mentally retarded.
Some time between 11:30 p.m. on July 18, 1985, and 6:00 a.m. the next morning, the back door to the Chaney residence was forced open. Jerry Culbert, Billy Joe Harris, Carlitha Culbert and Vivian Chaney were murdered. Each victim was found in a separate room. The youngest girls, Tomika, then 10 years old, and Marla, then 7 years old, were uninjured.
Twenty-nine year old Billy Joe Harris was killed in his front bedroom bed. He was shot twice in the left side of the head through a pillow. He was also shot twice in the chest. After being shot, he was still alive: his throat was cut. His hands were tied behind his back with shoelaces. His right wrist was tied tightly and a loop was made for the left wrist in a handcuff ligature. His ankles were also tied together with shoelaces. A telephone cord was used to tie his hands to his ankles. He was fully clothed.
*1377 Twenty-five year old Jerry Culbert was fatally shot once at close range in the left side of his head. He was found in his bed, still in his bedclothes, in the back bedroom of the house. There was no sign of a struggle; he was apparently killed while he slept. There were no ligatures on this victim.
Fifteen year old Carlitha Culbert was found in the living room. She was lying on her stomach with her hands tied behind her with an electrical cord cut from an iron found in the house. The cord was wrapped tightly around her left wrist and then looped around her right wrist in the handcuff ligature. The electrical cord was loosely wrapped around her left ankle, as if there had been an attempt to hog-tie her. There was an untied piece of shoestring draped over her left leg. She had been gagged with silver duct tape. The shorts she was wearing were inside out.
Her throat was cut. Her body was then moved slightly. While still alive, she was almost decapitated. Two large pools of blood were found by her body. One area of blood near her left knee contained a blotted semicircle. A second pool of blood was found by her neck, where she finally bled to death.
Thirty-seven year old Vivian Chaney was found slumped over the bathtub. Her hands were tied behind her with a telephone cord. The cord came around the front of her waist and then down between her legs to tie her ankles. The bonds would have allowed her a hobbling walk. There was evidence that another ligature had been used around her neck to control her and to lead her around.
The back of Vivian's dress had a large amount of Carlitha's blood over the buttocks area and the lower hem, indicating that Vivian sat in the pool of blood caused by the initial cutting of her daughter's neck. There was evidence of both manual and ligature strangulation. She had been beaten violently about the head. She died from a combination of manual strangulation and bathtub drowning.
The bodies were discovered at 6:00 a.m. on July 19, 1985, by Shirley Culbert, the sister of Vivian Chaney and Jerry Culbert. She had just arrived from out of town and hoped to surprise the family. There was no answer to her knock at the front door, but she heard the stereo playing. She walked around to the back door, which opened when she knocked, and entered the house. She found Tomika and Marla asleep in a bed. It was very difficult to wake them. When she succeeded, the girls were hysterical. She took them out of the house and called the police. Relatives later discovered several items missing from the house, including Jerry Culbert's wallet, a jar of loose change, food stamps, a food stamp identification card, pictures of the girls and a striped tote bag. No money was found in the house, although Vivian Chaney had cashed a check for over $100 the day before.
Despite the number and viciousness of the murders, Dr. McCormick testified that the crimes were the work of one person. In his opinion, the crimes were committed by a serial killer working alone. Serial killers not only kill repetitively, but their crimes escalate. McCormick thought that this crime was an escalation of the Deborah Ford murder committed by the same person. The serial killer probably lived in the neighborhood and would be among the crowd gathered at the scene.
The scene indicated a logical progression as the sole murderer moved among the victims. The teenager, Carlitha, and a gun were used to control the adults.
McCormick theorized that the killer threatened Carlitha's life to immobilize Vivian Chaney and Billy Joe Harris. Vivian Chaney was tied so she could walk; Carlitha's hands were tied. After binding Billy Joe Harris, the killer shot him through a pillow to prevent disturbing the sleeping Jerry Culbert. Jerry Culbert was shot while he slept. The murderer next cut Carlitha's throat but did not kill her. He made Vivian Chaney sit down in her daughter's blood before taking Vivian to the bathroom and killing her by strangling and drowning. When the killer returned to the living room, Carlitha had either moved or the murderer moved her. He finished killing Carlitha by trying to decapitate her. At some point, the killer returned to Billy Joe Harris and stabbed him in the neck.
*1378 Investigative officers found pieces of duct tape consistent with the type used to gag Carlitha Chaney in the alley behind the Chaney house. Processing of the crime scene revealed three latent left palm prints on the bathtub over which Vivian Chaney's body was draped. McCormick theorized that the right-handed killer had used his dominant hand to hold her head under water while he steadied himself with his left hand. Testimony established that the fresh prints had been left after the tub had last been cleaned. The palm prints were later matched with Nathaniel Code's left palm print.
Oscar Washington, a National Guard member, was jogging that morning at approximately 2:15 a.m. in the area where Henderson Street intersects with 72nd and 73rd Streets. As Washington jogged south on Henderson, he saw Nathaniel Code, whom he knew from the neighborhood. The men spoke for a few minutes, Code telling Washington that he was going to tend to some business. Washington noticed Code had a little brown paper bag rolled up under his arm. Washington continued his run. Code headed north on Henderson, towards East 72nd Street.
About forty-five minutes later, Washington had turned around and was jogging north on Henderson. He again saw Code, this time between 73rd and 74th Street. Code, covered with blood, was heading south on Henderson. When Washington asked what had happened, Code stated he and someone had "got into it" and that "he had come out on top" and had "gotten even". Code now carried a peppermint striped bag. Code tried to sell Washington various things in the bag, including a knife Washington described as a dagger with a seven to eight inch blade, a hand gun, credit cards, food stamps and some marijuana. Washington noted the food stamps were smeared with blood.
Several days later, Washington again ran into Code. Code asked him, "What did you see me do?" When Washington told Code he did not know what Code was talking about, Code gritted his teeth and balled his fists. Washington testified Code made the same gesture when Code saw Washington sworn in as a witness. Although Washington heard about the Chaney homicides after they occurred, he did not know the details and did not immediately connect seeing Code that evening.
A neighbor, Ernest Demming, saw Code standing on the corner of Henderson and 72nd Street and staring at the Chaney house at 5:30 a.m. on July 19, 1985, before the bodies were discovered.
Code had been employed by a plumber from March 12 through the first week of July in 1985. A series of witnesses established that Code had never rented the residence at 213 East 72nd Street and had never done plumbing work in the house. Duct tape found in the alley behind the Chaney residence and the duct tape used to gag Carlitha Culbert were found to be chemically identical to duct tape later found at Code's house. The pieces of tape either originated from exactly the same roll or from separate rolls made by the same company. It was professional grade tape used by plumbers and other professionals, unavailable at retail stores.
The two survivors of the murders did not testify. Both Marla and Tomika were examined by doctors prior to trial and found to be mildly mentally retarded. Tomika was interviewed several times by the police and by doctors. Sodium pentothal was administered in an effort to retrieve information about what she may have witnessed. She gave conflicting stories. The majority of the time she stated one killer broke in the back door carrying a knife with holes in it and a rope. Tomika's drawing of the knife matched the description of a knife missing from Deborah Ford's house. She also gave other statements about the killer and "ladies" breaking in that night and putting flies and spiders on the face of Billy Joe Harris. Officers arriving on the scene found flies on Billy Joe Harris; the coroner found evidence of post-mortem roach bites on his face. Marla was generally withdrawn. By joint stipulation, the state and defense agreed not to call the girls as witnesses. Testimony regarding Tomika's differing statements and a videotape of Tomika's interview were admitted in evidence.

*1379 William Code Homicides: August 5, 1987

Nathaniel Code's 73-year-old grandfather, William T. Code, lived at 641 West 66th Street in Shreveport. On August 4, 1987, William Code worked in his yard with the two grandsons of a friend, Enamerteen Williams. The two boys, 8-year-old Eric Williams and 12-year-old Joe Robinson, were seen working with William Code in his yard as late as 8:00 p.m. Mrs. Williams gave telephone permission for the boys to spend the night with William Code, as they had done in the past.
Mrs. Williams became concerned when the boys did not return home the next morning and went to William Code's residence that afternoon. The doors were locked, and steel burglar bars on the windows and doors kept her from gaining entrance. There was no sign of forced entry. Although no one answered her knocking, she heard music playing. It was later discovered the television was on. Through the window she could see the bound foot of Joe Robinson. Mrs. Williams went home, called the police and returned with her brother, niece and granddaughter to William Code's house. After using her key to open the burglar bars on one of the windows, Mrs. Williams and her brother discovered the bodies of William Code and the two boys. All three victims were found in separate rooms.
Joe Robinson was found lying face down on the living room couch. He had been struck in the forehead with a blow severe enough to have dazed him. He had bruises on the shoulders beneath the skin and over both collarbones. His ankles were tied with a white plastic cord. Each end of the cord was tied around an ankle and there was a gap in between. A length of the same cord had been used to tie his hands together behind his back, with one end of the plastic cord tied to one wrist and the other end tied to the other wrist like handcuffs. A loose length of cord around his neck held a gag; a doubled length of the cord was used to strangle him. The boy was only wearing a pair of underwear which had been turned inside out.
Eric Williams was found lying face down between two twin beds in a small bedroom where he had been dragged from one of the beds. Plastic rope held a gag around his neck. His hands had been tied identically to the way the other boy's hands were tied, in a handcuff ligature. One ankle was tied with this cord, but then it ran out. The killer then took electrical cord to finish binding the boy's ankles together. A second length of electrical cord was used to strangle the boy. There were no signs that a struggle took place. The boy was wearing a pair of underwear.
William Code was found lying face down on his bed, dressed in a dressing gown. His ankles were bound with electrical cord, then the cord was brought up the front of his legs and tied to his wrists. His hands were tied behind his back with electrical cord in the handcuff ligature. A telephone cord around his neck held a gag in place.
The autopsy showed William Code had been struck a very heavy blow to the side of his head which alone could have caused his death. Hemorrhages in his brain were consistent with being beaten about the head with a fist. He had been stabbed five times in the chest, seven times in the back, and once in a major artery of the right upper arm with a long knife. Several of these wounds would have been fatal, but William Code died of their cumulative effect. Pat Wojtkiewicz of the North Louisiana Crime Lab testified that medium velocity blood spatter was found on the wall in William Code's bedroom where he was killed.
McCormick testified that one person was responsible for the murders. The two boys were tied in the same way, gagged in the same way and killed in the same way. Materials from the house were used to tie William Code. McCormick testified the victims were probably killed in the order in which they were found. Since there was no sign of forced entry, Robinson probably let the murderer in the front door. Robinson was subdued by a strong blow to the head, then gagged, tied and strangled. Williams, who was in the front bedroom, was probably surprised as he slept. There was no sign of a struggle. Williams was then tied and killed.
McCormick testified that the focus of the murders was William Code. There was no *1380 element of overkill in the two boys and no knife was used on them. By contrast, William Code was beaten repeatedly over the head and rolled front and back to be stabbed many more times than would have been necessary to kill him. McCormick theorized that this showed an emotional relationship between the victim and the murderer.
No money was found in the residence, although William Code had cashed checks totalling between $400 and $600 the day before he was murdered. A small caliber pistol was missing as well. Investigators found a knife and a set of keys in a storm drain approximately 600 feet from the residence. The knife was similar to a set found in William Code's kitchen; the keys fit the victim's door.
Donald Ray Johnson, William Code's neighbor, testified he saw Nathaniel Code exit William Code's residence sometime after 8:00 p.m. the night of the murders. Johnson saw Code shut the inner door and the iron bars, check to make sure they were locked, then walk out to a vehicle. Code drove down the street toward Johnson and stopped to say hello through the car window. Code introduced the female passenger in the car as his new wife, then the two drove off. Johnson thought the situation unusual because William Code always walked guests to the door to make sure the security doors were locked and because he knew William Code would not allow Nathaniel Code into his house. Johnson had been present two weeks before when William Code had refused to loan any more money to his grandson because Nathaniel Code had not paid him back.
John Huckabee, an electrician who installed security lighting at the Code residence, testified about a conversation he had with William Code in which William Code stated he was afraid of his grandson and told of Nathaniel Code's attempt to borrow money from him in the past. William Code had refused to lend his grandson the money.
After the bodies were found, Nathaniel Code approached investigating officers and introduced himself as the victim's grandson. Code stated he had received a call from William Code on the evening prior to the murders at approximately 10:30 p.m. or 11:00 p.m. in which William Code asked him to come to his residence complaining there were people hanging around his house. Code stated he went to his grandfather's house at approximately 2:00 a.m. on the morning of August 5. Nathaniel Code stated that after his grandfather let him into the house, he checked the house and the surrounding area for suspicious persons, then left on his bicycle. He returned once to check the outside again, then rode his bicycle home.
Nathaniel Code agreed to accompany police to the station to give a statement since he was, apparently, the last person to see his grandfather alive. Investigators became suspicious of Code because he stated he touched the vacuum, fan, humidifier and phone while at his grandfather's house; these were the items from which the electrical cord was cut to bind the victims. Code agreed to allow the police to seize the clothes and shoes he had worn the day before.
His finger and palm prints were matched to the latent palm prints found at the Chaney homicide. Code was informed of his constitutional rights, questioned and arrested for the Chaney homicides. Later, Wojtkiewicz of the crime lab located a medium velocity blood spatter on the tennis shoes worn by Code. Although the crime lab determined the blood was human, there was an insufficient amount to do any further typing.
Later, the police obtained consent from Code's wife to search their residence. Among other items, police seized several cut electrical cords and professional grade duct tape.
Testimony was adduced that Nathaniel Code had approached several people seeking a loan just prior to the murders. The day before the bodies were found, Nathaniel Code had approached Shreveport narcotics officers and offered his services as a paid confidential informant. He indicated that he knew of persons who were dealing drugs and needed $100 to pay one of them.
The day the bodies were found, Nathaniel Code called his cousin, Beatrice Holmes, and invited her to his house. The two shared a gram of cocaine which Code supplied and then went to a liquor store where Code purchased *1381 beer. On the way home, he purchased a second gram of cocaine. Holmes and Code were shooting this cocaine when they were interrupted by a phone call informing them of William Code's death. Holmes testified that a gram of cocaine sold for $150 at that time.

USE OF "OTHER CRIMES" EVIDENCE
The defendant contends it was reversible error for the trial court not to exclude evidence concerning the Ford homicide and the William Code homicides in the guilt and sentencing phases of his trial. He argues the state did not establish that the evidence had an independent relevance and failed to sufficiently prove the defendant was involved in the perpetration of the other crimes.

Guilt Phase
In general, evidence of other crimes is inadmissible in the guilt phase of a criminal trial for several reasons. Admission of evidence that the defendant may have committed other crimes creates the risk the defendant will be convicted of the present offense simply because he is a "bad person." Juror confusion may occur where collateral issues are introduced. In addition, a defendant may not be prepared to face such attacks. State v. Bourque, 622 So.2d 198, 233 (La.1993); State v. Prieur, 277 So.2d 126, 128-30 (La.1973).
Statutory and jurisprudential exceptions exist to this rule where the state offers evidence of other crimes for purposes other than to show the character of the defendant. State v. Jackson, 625 So.2d 146 (La.1993). La.Code of Evid. art. 404(B)(1) provides:
Except as provided in Article 412 [not relevant here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
State v. Prieur outlined the procedure to be used when the state intends to offer evidence of other criminal offenses. The Prieur decision dealt with LSA-R.S. 15:445 and 446, now-repealed statutes detailing the admissibility of other crimes evidence. La.Code of Evid. art. 1103 provides that the notice requirements and evidence standards of Prieur and its progeny have not been overruled by the new Code of Evidence. Under Prieur, the state is required to give a defendant notice that evidence of other crimes will be offered and which exception to the general exclusionary rule the state is relying upon. Prieur, 277 So.2d at 130. In addition, the state must prove by clear and convincing evidence that the defendant committed the other crimes. Prieur, 277 So.2d at 129.
Case law has established an exception to the general inadmissibility of other crimes evidence to include evidence showing modus operandi. See State v. Henry, 436 So.2d 510 (La.1983); State v. Talbert, 416 So.2d 97 (La.1982); State v. Hatcher, 372 So.2d 1024 (La.1979). Several factors must be met for evidence to be considered as evidence of modus operandi:
(1) there must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith; (2) the modus operandi employed by the defendant in both the charged and the uncharged offenses must be so peculiarly distinctive that one must logically say they are the work of the same person; (3) the other crimes evidence must be substantially relevant for some other purpose than to show a probability that the defendant committed the crime on trial because he is a man of criminal character; (4) the other crimes evidence must tend to prove a material fact genuinely at issue; and (5) the probative value of the extraneous crimes evidence must outweigh its prejudicial effect.
Hatcher, 372 So.2d at 1033 (citations omitted); see also State v. Henry, 436 So.2d at 513; Talbert, 416 So.2d at 99-100.
Prior to trial, the state notified the defendant of its intent to use evidence of the Ford *1382 homicide and William Code homicides in the guilt phase "for the purpose of showing motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident" under La.Code of Evid. art. 404B. In addition, the state claimed the evidence of the William Code homicides had independent relevance constituting an integral part of the acts and transactions regarding the Chaney homicides.
At a pretrial hearing, the state introduced evidence to show the connection between the defendant and the Ford homicide. The point of entry into the Ford residence was determined to be the bathroom window. Fingerprints left on the window were consistent with someone entering the house from the outside and were inconsistent with someone standing in the bathroom and touching the window. The fingerprints had been left very recently. The fingerprints were matched to the defendant.
The state introduced evidence to show the connection between the defendant and the William Code homicides. The defendant placed himself at the elderly Code's residence the night he and the two boys were murdered. The defendant acknowledged touching each electrical appliance and phone from which cords were taken to bind the victims. The defendant was seen leaving the Code residence. William Code did not follow his usual practice of walking visitors out and checking the security doors. The defendant left the residence and drove down the street in the direction where Code's house keys and a knife were discovered the next day. There was no sign of forced entry into the house, implying the victims knew their killer. William Code was afraid of the defendant and would not have let him into his house: Joe Robinson probably admitted him. No money was found in the house despite the fact William Code had between $400-$600 dollars in cash. Prior to the murders, the defendant had tried to borrow money from several persons, including William Code, and was refused. On the day the bodies were found, the defendant had several hundred dollars. Medium-velocity blood spatters were found in William Code's bedroom. A medium-velocity blood spatter was found on the shoe the defendant wore the night of the murders.
In addition to this evidence, the state presented the expert testimony of Dr. McCormick, the coroner for Caddo Parish. McCormick testified all three crime scenes were signature crimes of one person. He believed one person committed all the murders because the harm was done in a sequential manner and there were similarities in how the persons were handled and killed. The signature aspects found by McCormick were the handcuff-type bindings with electrical cord, the use of a knife to stab or cut and the immobilization of the victims.
Supervisory Special Agent Douglas of the FBI testified as an expert in the field of criminal investigative analysis. He explained the difference between the "modus operandi" and the "ritual aspects" of a crime. Modus operandi is learned behavior which can change as a criminal learns, modifies and adapts his behavior to fit a particular situation. Ritual aspects of a crime do not change and are linked to the criminal's internal need to do certain things. Douglas was convinced the murders were the work of one person.
Douglas acknowledged that these crimes had modus operandi dissimilarities in point of entry, weapons used and time sequence between killings. However, the crimes had several identical ritual aspects, the most important being the distinctive handcuff ligature. Douglas had never seen this type of ligature before, nor had any crime enforcement personnel he consulted. In addition to the unique way the ligatures were tied, Douglas noted the use of electrical appliances from inside the residences. So unique were the bindings that he stated "[i]f you would put all those cases together in one pile, you would look and say, `This all happened at one case. This is one instance.'" He noted Vivian Chaney and William Code were tied in an identical manner.
Another ritual aspect of the murders Douglas recognized was the killer's need for manipulation, domination and control over his victims. Placing the victims in different rooms was consistent with this ritual. The positioning of Deborah Ford and Carlitha Chaney was almost identical.
*1383 Douglas also noted the aspect of overkill present in each crime scene, i.e., the victims were not just stabbed, they were almost decapitated. Another ritual aspect was the predominant use of a knife. So prevalent were the cases' ritual aspects that Douglas testified "it is not even a difficult case for us, we believe, to show the signature aspect." Each law enforcement officer that visited the three crime scenes was convinced the murders were the work of the same person.
After hearing this evidence, the trial court ruled the evidence admissible. The trial court concluded that the state met the requirements of Prieur and those of art. 404(B) by clear and convincing evidence. The trial court held the probative value of the evidence was not substantially outweighed by unfair prejudice.
We find no error in the trial court's ruling. The state showed by clear and convincing evidence the commission of the other crimes and the defendant's connection to them. The expert testimony established that these were signature crimes. The ritual aspects of the Chaney homicides, the Ford homicide and William Code homicides were so distinctive as to lead to the conclusion they were the work of the same person. The issue of identity was genuinely at issue in this case. The other crimes' probative aspect on the identity issue outweighed their prejudice to the defendant.

Sentencing Phase
The defendant also argues it was reversible error for the trial court to allow evidence of these unadjudicated other crimes in the sentencing phase of the trial. In the bifurcated sentencing phase of a first degree murder trial, the character of the defendant is automatically at issue, whether the defendant has placed his character at issue or not. State v. Bourque, 622 So.2d 198, 245 (La. 1993); State v. Jackson, 608 So.2d 949, 953 (La.1992); La.C.Cr.P. art. 905.2. "This court has previously determined the enumerated aggravating circumstances of La.C.Cr.P. art. 905.4 should not be considered as limiting the scope, or controlling the admissibility, of the sentencing hearing's inquiry into a defendant's character." Bourque, 622 So.2d at 246. Evidence of unadjudicated other crimes is relevant and probative evidence of the defendant's character and propensities. Jackson, 608 So.2d at 954-56; State v. Brooks, 541 So.2d 801, 813 (La.1989).
In Brooks, this court held such evidence of unadjudicated crimes admissible during the sentencing phase after the trial court determines "1) the evidence of defendant's connection with commission of the unrelated crimes is clear and convincing; 2) the proffered evidence is otherwise competent and reliable; and 3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is the focus of the sentencing hearing under La.C.Cr.P. art. 905.2." Brooks, 541 So.2d at 814.
The Brooks holding was further limited in Jackson "to that [evidence] which involves violence against the person of the victim," and "to that conduct for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried." Jackson, 608 So.2d at 955.
The record shows the state gave notice of its intent to use evidence of the Ford and William Code homicides at the sentencing phase of the trial to show the defendant's character and propensities. After the Prieur hearing was held, and the evidence was ruled admissible in the guilt phase, the trial court held the state had also met the Brooks' requirements for introduction of the evidence in the sentencing phase.
We find no error in the trial court's ruling. The state showed by clear and convincing evidence the defendant's connection with the unrelated crimes. The evidence of the Ford and William Code homicides was otherwise competent and reliable and had relevant and probative value as to the defendant's character and propensities. Jackson, 608 So.2d at 955 ("crimes of violence against the person indicate moral qualities and character traits pertinent to the propensity to commit first degree murder"). The Jackson limitations as to the type of evidence admissible were also met. In addition, evidence of these other crimes was not the only information given *1384 to the jury. Much testimony was devoted to the defendant's psychological makeup; other information was introduced as to his character and propensities. There was no focus on the other crimes evidence which might have shifted the jury's focus from a determination of an appropriate penalty for the Chaney homicides. Compare State v. Bourque, 622 So.2d 198 (La.1993).

UNASSIGNED ERROR
This Court's review of the record of a capital defendant includes a review for record error. Two expert witnesses opined that the defendant was the perpetrator of the Chaney homicides. Sgt. L.L. Jackson, a fingerprint expert, stated he positively believed the palm prints left by the defendant on the Chaney's bathtub were left when the defendant drowned Vivian Chaney. Tr. 4048, 4069-70. Detective Mark Rogers, an expert in fingerprint and crime scene analysis, testified that the palm prints lifted from the bathtub, which had been matched to the defendant's, were left by the perpetrator of the crime. Tr. 4126. No contemporaneous objection was raised to this testimony. The lack of contemporaneous objection or assignment of error as to this issue does not preclude this Court's review in a capital case. State v. Smith, 554 So.2d 676 (La.1989).
When defense counsel did object to the general nature of this testimony during the testimony of another expert witness, the trial court sustained the objection and requested that the state rely on hypothetical questions which would avoid suggestiveness in the answers.
La.C.E. art. 704 provides:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
This Court has held it is reversible error for an expert witness to testify as to an ultimate issue of the defendant's guilt, even when couched in terms of a hypothetical situation. State v. Jones, 558 So.2d 546 (La. 1990); State v. White, 450 So.2d 648 (La. 1984); State v. Montana, 421 So.2d 895 (La. 1982). Sgt. Jackson's opinion that the defendant left his palm print on the bathtub when he killed Vivian Chaney expressly violated the prohibition against expert testimony on an ultimate issue of fact. The testimony of Detective Rogers implicitly violated the rule as well.
Finding this error, however, does not necessarily end our analysis. The Supreme Court has implied the harmless error analysis is available for trial errors which may deprive the jury of its factfinding role. In Carella v. California, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (per curiam), the United States Supreme Court remanded for a determination of whether a harmless error analysis applied where the jury was erroneously instructed as to the applicability of a mandatory conclusive presumption. The Court noted "[t]he Due Process clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. Jury instructions relieving States of this burden violate a defendant's due process rights. Such directions subvert the presumption of innocence accorded to accused persons, and also invade the truth-finding task assigned solely to juries in criminal cases." Carella, 491 U.S. at 264, 109 S.Ct. at 2420 (citations omitted and emphasis supplied). The mandatory directions at issue in Carella directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offense with which the defendant was charged. See also Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (case remanded for lower courts to determine application of harmless error analysis to jury instruction containing misdescription of an element of the crime which deprived jury of its factfinding role).
The proper analysis for determining harmless error is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, ___ U.S. ___, ___, *1385 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (emphasis in original).
Prior to the Supreme Court's Sullivan opinion, which replaced the earlier harmless error analysis of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), Justice Scalia suggested a separate harmless error analysis when reviewing an error which deprives the jury of its fact-finding role. See Carella, J. Scalia concurrence, joined by Justices Brennan, Marshall and Blackmun. Justice Scalia suggests the following analysis:
When the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed. The error is harmless because it is "beyond a reasonable doubt" that the jury found the facts necessary to support the conviction.
Carella, 491 U.S. at 270, 109 S.Ct. at 2423 (J. Scalia, concurrence, internal citation omitted).
Under either the Sullivan harmless error analysis or the separate analysis suggested by Justice Scalia in Carella, the record of this case shows the error at issue here was unmistakably harmless. The state called five expert witnesses who testified the palm prints recovered from Vivian Chaney's bathtub matched the defendant's prints and were left on the recently cleaned bathtub near the time of the murder. Expert testimony made clear the prints were left as a result of forceful pressure downward and were inconsistent with those that would be left by someone getting in or out of the bathtub. Expert testimony established the palm prints were in such a position that they could only have been left by someone who held Vivian Chaney over the bathtub. The position of Vivian Chaney's body draped over the bathtub supported this conclusion. The state presented extensive evidence to show the defendant had never rented the Chaney house and had never worked there as a plumber.
In addition, the trial court instructed the jury that it alone was to determine ultimate issues:
It is the duty of the jurors to consider the opinions of an expert together with all the other testimony in the case and to give them such weight as they deem proper. However, experts are not called into court for the purpose of deciding the case. You, the jurors, are the ones who, in law, must bear the responsibility of deciding the case. The experts are merely witnesses, and you have the right to either accept or reject their testimony and opinions in the same manner and for the same reasons for which you may accept or reject the testimony of other witnesses in the case.
Tr. 5381.
Considering the admissible evidence concerning the palm prints, no rational juror could find those facts without also finding the ultimate fact of the defendant's guilt. It is beyond doubt the guilty verdict in this case was unattributable to the erroneous testimony.

CAPITAL SENTENCE REVIEW
This Court reviews every death sentence to determine if it is excessive. LSA-C.Cr.P. 905.9. Under Supreme Court Rule 28, the factors reviewed include: (1) whether the sentence was imposed under the influence of passion, prejudice or other arbitrary factors; (2) whether the evidence supports the finding of one or more statutory aggravating circumstances; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

PASSION, PREJUDICE OR OTHER ARBITRARY FACTORS
There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death penalty. Defendant and all of his victims are African-Americans.

AGGRAVATING CIRCUMSTANCES
Three aggravating circumstances were found: (1) Code was engaged in an armed *1386 robbery; (2) he killed more than one person; and (3) at least three of the murders were committed in a heinous and cruel manner, involving unnecessary pain and torture.
There was direct and circumstantial evidence that Code broke into the home of the victims, armed with a knife and a gun, and robbed them. The evidence establishes beyond any reasonable doubt that Code murdered the four members of the Chaney household, Vivian Chaney, Carlitha Culbert, Jerry Culbert and Billy Joe Harris.
Jerry Culbert was shot once in the head while sleeping. The jury correctly found that Jerry Culbert's murder was not heinous. Billy Joe Harris bled to death after his throat was slashed, and he was also shot. Vivian Chaney was severely beaten, dragged by a neck cord, partially strangled and drowned in her bathtub. Vivian Chaney sat in her daughter's blood while Code slashed at her daughter Carlitha's throat. Carlitha was bleeding to death when Code slashed her throat again, nearly decapitating her. The jury correctly concluded that three of the charged murders were committed in an especially cruel manner involving torture and unnecessary pain.

PROPORTIONALITY
Nathaniel Robert Code, Jr. was born March 12, 1956, and was 29 years of age when he committed the Chaney murders on July 19, 1985. Code was given extensive testing. The tests revealed no organic brain disorder. Code has normal intelligence. He can distinguish right from wrong and was able to cooperate intelligently in his own defense. He has no apparent mental or physical impairments. Code was diagnosed in 1975 as a paranoid schizophrenic, but the medical experts who examined him in connection with this trial questioned that diagnosis.
In the opinion of Dr. Mark Vigen, a psychologist, Code is not schizophrenic. Dr. Paul Ware, a psychiatrist, testified that the 1975 diagnosis of paranoid schizophrenia was erroneous. Dr. Ware said that Code has an antisocial personality disorder. Another psychiatrist, Dr. Kenneth Ridder, agreed that Code has a borderline personality disorder. According to Dr. Mark Zimmerman, a clinical psychologist, Code has a borderline personality disorder and will decompensate into paranoid schizophrenia under stress. Dr. Richard Rappaport, a forensic psychiatrist, testified that Code suffers from a borderline personality disorder but could have been psychotic when he committed the murders.
The statutory mitigating circumstances are set forth in LSA-C.Cr.P. art. 905.5:
Art. 905.5 Mitigating circumstances
The following shall be considered mitigating circumstances:
(a) The offender has no significant prior history of criminal activity;
(b) The offense was committed while the offender was under the influence of extreme mental or emotional disturbance;
(c) The offense was committed while the offender was under the influence or under the domination of another person;
(d) The offense was committed under circumstances which the offender reasonably believed to provide a moral justification or extenuation for his conduct;
(e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication;
(f) The youth of the offender at the time of the offense;
(g) The offender was a principal whose participation was relatively minor;
(h) Any other relevant mitigating circumstance.
None of the statutory mitigating circumstances are present here. Code's work history is sporadic. He served 15 years at hard labor for attempted aggravated rape. There is no evidence that any other person was involved in the crimes. Code's crimes are not mitigated by youth. See Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Code does not have a deficient mentality or other handicap which would weigh in favor of a lesser sentence.
*1387 The Louisiana statute allowed the jury to consider all relevant mitigating evidence. Compare Johnson v. Texas, ___ U.S. ___, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).
Since January 1, 1976, there have been no comparable murders in Caddo Parish. A death sentence was imposed on Glenn Ford in State v. Glenn Ford, 489 So.2d 1250 (La. 1986), cert. granted and judgment vacated at 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133, on remand, 503 So.2d 1009 (1987). The only aggravating circumstance was armed robbery. The victim was shot once through the head, and the murder was not heinous.
There are other multiple murder cases in Louisiana. A death sentence was imposed in State v. Deboue, 552 So.2d 355 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174, reh. denied, 498 U.S. 993, 111 S.Ct. 541, 112 L.Ed.2d 550 (1990), where two children, ages six and eleven, were killed during an armed robbery by having their throats slashed with razor blades and a knife. The death sentence was also rendered in State v. Perry, where Perry killed five family members and the aggravating circumstance was a risk of death to more than one person. State v. Perry, 502 So.2d 543 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156, reh. denied, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987). There was a death sentence in State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704, reh. denied, 478 U.S. 1032, 107 S.Ct. 13, 92 L.Ed.2d 768 (1986), where five people were shot and the aggravating circumstance was a risk of death to more than one person.
Death penalties were imposed in State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 reh. denied, 471 U.S. 1145, 105 S.Ct. 2691, 86 L.Ed.2d 708 (1985); and in State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 reh. denied, 472 U.S. 1033, 105 S.Ct. 3516, 87 L.Ed.2d 645 (1985). Wingo and Glass bound and gagged their two elderly victims and shot each of them once in the head. The jury found the same three aggravating circumstances that the jury found in this case. On appeal, the question of whether the murders were especially heinous, atrocious and cruel was pretermitted.
Death sentences have generally been imposed where there were multiple murders. Only in State v. Wingo and State v. Glass did the jury find the same three aggravating circumstances. The heinous aspect of Code's crimes is much clearer than it was in the Glass-Wingo murders. Considering Code's character and record, and the circumstances of the offenses, Code's death sentence is not disproportionate to that imposed in similar cases in Louisiana.
For the reasons assigned, the conviction and sentence of defendant, Nathaniel Robert Code, Jr., are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution as provided by LSA-R.S. 15:567 until:
(a) defendant fails to petition the United States Supreme Court timely for certiorari;
(b) that court denies his petition for certiorari;
(c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari; or
(d) that court denies his application for rehearing.
AFFIRMED.
NOTES
[1] Pursuant to Rule IV, Part 2, § 3, Calogero, C.J. was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).