# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-1492

**STATE OF LOUISIANA**

**VERSUS**

**DANIEL PICKETT**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 02-K0437C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, C.J., Sylvia R. Cooks, and Oswald A. Decuir, Judges.

**AFFIRMED.**

**G. Paul Marx
Attorney at Law
P. O. Box 82389
Lafayette, LA 70598-2389
Telephone:  (337) 237-2537
COUNSEL FOR:**
　　　**Defendant/Appellant - Daniel Pickett**

**Earl B. Taylor
District Attorney - Twenty-Seventh Judicial District Court
Alisa Ardoin Gothreaux
P. O. Drawer 1968
Opelousas, LA 70571-1968
Telephone:  (337) 948-0551
COUNSEL FOR:**
　　　**Plaintiff/Appellee - State of Louisiana
Daniel Pickett**

**St. Landry Parish Jail**
**P. O. Box 390**
**Opelousas, LA 70570**

THIBODEAUX, Chief Judge.

The Defendant, Daniel Pickett, was convicted of second degree murder following a jury trial. He was sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence.

The Defendant appeals his conviction. We affirm.

## FACTS

On the evening of July 25, 1991, Susie Lee Pickett, the eighty-six-year-old great-aunt of the Defendant, was beaten and shot. She was found dead the next morning in the bedroom of her home in the rural community of Morrow in St. Landry Parish. Deputies discovered that her attacker had entered her home by breaking a porch window and then kicking in a panel on the door to her kitchen. During the investigation, the Defendant, who lived in a nearby home, submitted DNA samples and the shoes he was wearing to deputies. Several years later, DNA testing revealed the Defendant's blood sample was a match to a blood smear sample that had been collected from the panel of the victim's door. Further analysis of the Defendant's shoe revealed a blood droplet that was matched to the victim's blood sample. In addition, glass particles collected from the bottom of the Defendant's shoes were similar to the glass from the broken window at the murder scene.

### Failure to Suppress Shoes

The Defendant contends the trial court erred in not suppressing his shoes that he claims were unconstitutionally seized without probable cause or reasonable suspicion. He argues that he did not resist the seizure of his shoes, but acquiesced when the seizing officer told him he had to give them up. The State asserts the Defendant voluntarily gave up his shoes after he was asked by an officer to do so.

1

At the hearing on the motion to suppress, St. Landry Parish Detective Vernon Marks testified that on July 28, 1991, a few days after the murder of the victim, a mobile command unit had been set up in Morrow. He stated the murder investigation had not centered on a suspect, but that they were interviewing many people in the area. As part of the investigation, Detective Marks met with the Defendant at the command post.

Detective Marks identified the waiver of rights form signed by the Defendant on July 28, 1991, at 4:45 p.m. He stated he read the rights to the Defendant and signed the form as a witness. Detective Marks testified that the Defendant was not threatened, coerced, pressured, induced, or promised anything in exchange for his cooperation. He stated the Defendant was calm and cooperative. Detective Marks testified he asked the Defendant if he understood his rights and if he wished to talk and he said "yes." Two hours after the interview began, the Defendant signed a written statement denying his involvement in the crime.

Detective Marks stated the Defendant indicated he would do anything to cooperate with the investigation. The Defendant agreed to give blood, saliva, and other samples. He mentioned to the Defendant that he wanted his clothing and he consented. Detective Marks testified the Defendant did not ask any questions or express any hesitation or reservation concerning the request. The Defendant was not asked to submit his clothing, but his shoes were taken into evidence.

Detective Marks testified at the hearing as follows:

> Q. And so you, did you communicate to the defendant you were interested in him voluntarily turning over those shoes?
>
> A. Yes.
>
> Q. And his response was?
>
> A. He was cooperative.

The Defendant was transported to an area hospital for the collection of his DNA samples. Detective Marks asked Detective Rivette to take the Defendant's shoes after the samples were obtained.

On cross examination, Detective Marks stated the Defendant was not a suspect nor under arrest at the time he was questioned. The end of Defendant's written statement reads: "I am willing to take a polygraph, submit saliva, head hair, pubic hair, blood and information on my grandfather's 22 caliber pistol which was reported stolen a few months ago." The statement does not mention anything about the Defendant's shoes. Although the statement specifically lists other items the Defendant had agreed to provide, it does not indicate that the shoes were requested or voluntarily given. Detective Marks testified that he did not tell the Defendant that he had to give up his shoes, but did tell him that "we needed the shoes." He denied telling the Defendant that he was going to take the shoes. Detective Marks stated he told the Defendant he wanted the shoes.

Detective Marks testified that Detective Rivette met him later and turned over the evidence collected from the Defendant. He stated he did not think Rivette brought the Defendant back to the command post with him at the time.

Chief Detective Rene Speyrer testified at the hearing that he was in and out of the office when the Defendant was being interviewed. He and Detective Marks discussed taking the Defendant's shoes as part of the investigation. Detective Speyrer was not present when the Defendant was asked for his shoes. He stated that after Detective Rivette returned from the hospital, he brought the Defendant to the command post. With the Defendant standing there, Detective Rivette was told to take the Defendant's shoes when he brought him home. Detective Speyrer testified the Defendant did not state any objection. Detective Speyrer stated that he told Rivette not to forget the Defendant is giving "us" his shoes, and to pick up the shoes when he

3

brought the Defendant home. He added that he told Detective Rivette "We need his shoes." "He's cooperating." "He's giving us everything that we asked for." Detective Speyrer thought Detective Marks was present for this conversation.

Detective Roland Rivette testified that after he transported the Defendant to the hospital and returned him to the command post Detective Speyrer said "we needed his shoes." When he brought the Defendant home, he asked him for his shoes and he voluntarily gave them to him without hesitation. On cross examination, Detective Rivette said he told the Defendant they needed his shoes and he gave them to him and walked barefoot into his grandfather's house. He testified he did not tell the Defendant he did not have to give him his shoes.

The Defendant testified at the hearing that a few days after the murder the police contacted his mother and told her they were coming to pick him up for questioning. He stated he stayed at his mother's house until a deputy arrived and took him to the mobile command post. The Defendant testified that Detective Marks questioned him. The Defendant stated that he agreed to give a blood sample. He explained that once at the hospital other samples were collected from him. The Defendant testified he consented only to the blood samples.

After leaving the hospital, the Defendant stated he did not remember being returned to the command post, but Detective Rivette had taken him to his uncle's house in Krotz Springs where his mother was. The Defendant testified as follows:

> A. Well, I was getting out of the car, Roland Rivette said, "I hope you're not planning on going dancing anywhere because I got to have your shoes." I told him, I said, "That's the only shoes I got." He said, "Well you still got to give em up."
>
> Q. Alright. And did you do that?

4

A. Yes, sir. I gave em up not knowing if I had any choice to give em up or not. I . . .

The Defendant testified that the taking of his shoes was never discussed at the command post, and the first time it was brought up was when he was dropped off by Detective Rivette. He stated that was his only pair of shoes.

On cross examination, the Defendant stated that at the time of the investigation he was on probation for simple burglary. He testified that he moved from his grandfather's house to his mother's house the day after the murder because she asked him to move in with her.

In denying the motion to suppress, the trial court stated:

> The Court also finds that the physical evidence was properly seized without search warrants. Particularly the shoes. The defendant's voluntarly [sic] surrendered those items to the Sheriff's Deputies.
>
> Detective Roland Rivette testified and said he asked the defendant for the shoes. He gave them voluntarily. The defendant had offered to cooperate. He gave a number of statements over a period of years. He submitted to polygraph.
>
> When you consider the totality of the circumstances, the defendant freely and voluntarily surrendered the shoes. He wanted to cooperate.

The State bears the burden of proof to show the admissibility of any evidence seized without a warrant. La.Code Crim.P. art. 703(D). In *State v. Bargeman*, 98-617 (La.App. 3 Cir. 10/28/98), 721 So.2d 964, *writ denied*, 99-33 (La. 5/28/99), 743 So.2d 658, this court stated:

> When a trial court rules on a defendant's motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress. The appellate court should not overturn a trial court's ruling, unless the trial court's conclusions are not supported by the evidence, or there exists an internal inconsistency in the testimony of the witnesses, or there was a palpable or obvious abuse of discretion. *State v. Burkhalter*, 428 So.2d 449 (La.1983), and *State v. Gaspard*,

5

96-1279 (La.App. 3 Cir. 2/11/98); 709 So.2d 213. The admissibility of evidence seized without a warrant is a question for the trial court. Its conclusions on credibility and the weight of testimony regarding the voluntariness of a consent for admissibility purposes will not be overturned on appeal, unless the conclusions are unsupported by the evidence. *State v. Gachot*, 609 So.2d 269 (La.App. 3 Cir.1992), *writ denied*, 617 So.2d 1180 (La.1993), *cert. denied*, 510 U.S. 980, 114 S.Ct. 478, 126 L.Ed.2d 429 (1993).

*Id*. at 967.

Based on the totality of the circumstances, the State met its burden of proving the Defendant's surrender of his shoes was voluntary. Three detectives testified that the Defendant was cooperating with the investigation. Detective Marks and Detective Rivette stated that they asked the Defendant to give up his shoes and he consented. Detective Speyrer testified that he reminded Detective Rivette to get the shoes in front of the Defendant and he did not object. The Defendant denied talking to Detectives Marks or Speyrer about his shoes. He testified that Detective Rivette told him he had to give up his shoes.

The issue of consent in this case turns on the credibility of those testifying and the weight of the evidence. It is not the role of this court to second-guess these determinations of the trial court. Therefore, it cannot be said the trial court abused its discretion in denying the motion to suppress.

### Inadmissibility of Expert Testimony

The Defendant complains the trial court erred in allowing expert witness testimony which reached conclusions that were solely within the province of the jury. In his brief to this court, the Defendant states: "The State relied on the head of the crime lab to comment on the inferences to be taken from the cumulative forensic evidence . . . . This witness simply recounted testimony of other experts and reached a conclusion that the science added up to prove what the D.A. suggested."

6

The Defendant specifically complained about the expert forensic scientist testimony of Acadiana Crime Lab Director Ray Wickenheiser. The Defendant argues that Wickenheiser made an improper comment on the credibility of the evidence by acting as an "evidence gauge" and presenting argument for the State regarding the weight of the evidence against him. The Defendant does not specify what testimony he is complaining of, but instead cites three pages of the record as evidence of the improper comments.

During direct testimony at trial, Wickenheiser testified as follows:

Q. Assuming that Ms. Bergen stands up and testifies that the fingerprint, the latent prints that Ms. Colomb testified that she picked up, that they can't make an identification. They can't conclude that any one (1) person gave the fingerprints found at the scene. And also assuming that there is expert testimony that the blood found on the shoes and you've seen the shoes and we've gone through the shoes. That that blood is Susie Pickett's blood to a scientific certainty ok, so, let me take you through. 1) If the blood as a Scientist, if the blood on the shoe is Ms. Pickett's shoe, Ms. Pickett's blood, right?

A. Right.

Q. That's a scientific, we assume that?

A. Yes, sir.

Q. If glass is scientifically, using the term optically and microscopically indistinguishable from the glass on the apparent point of entry to the Pickett Residence, if one (1) more, I'mma add one (1) more thing, if we assume that those shoes are brand new, they were brought [sic] the day Ms. Pickett was murdered ok?

A. Yes, sir.

Q. As a Scientist, is that overwhelming evidence that those shoes or that shoe was in that house when Ms. Pickett was dead?

A. Yes, sir. It's very significant evidence. It all links to one another. They all make sense as far as you've got a broken window. We have glass. You have a person who has been beaten and is bleeding. We have droplets of

7

blood on the top of the shoe versus the bottom of the sole of the shoe which means there is blood that's being, it's coming from someone. Either from their mouth or from the nose or it's being. And then you have not only the victim's blood and the suspect's blood involved. It's very significant. It's a very, this is good, good evidence that's comes into the crime laboratory. These are, this is what Forensic Chemistry, Forensic Science is all about. It is to be able to associate these types of evidence in a Court of law.

Q. Can you, I'm talking about the shoes. I'm only talking about the shoes. We're not talking about the person wearing the shoes. Is there any other reasonable explanation?

BY MR. LOPEZ: Your Honor, I mean this is totally improper now. I mean the last thing was totally improper. This is even more totally improper than it was five (5) seconds ago. This is a, a decision for this Jury to make when they evaluate the testimony. We might as well, Mr. Richard is, we might as well have just allowed all of these people to sit around and then we'll put em all up here and they make a decision. That's not what we do in these cases. We're having this man pass on stuff that he heard in the courtroom. That he didn't even work on. And now he is, he is asking about the exclusion of every reasonable hypothesis of innocence. Asking him to, to decide for this Jury what the evidence proves and doesn't prove and the circumstantial nature of it. This is totally improper.

BY THE COURT: Objection overruled Mr. Lopez.

## RE-DIRECT EXAMINATION CONTINUES:

Q. Do you know from a scientific stand point as an Expert in the field of Forensic Investigation is there any explanation for that confluence of circumstances other than that shoe was at the place where Ms. Pickett was murdered?

A. No, sir. I cannot think of any other, any other explanation for this.

The expert was questioned further as follows:

Q. Let's talk about the blood. What as an Expert Forensic Scientist what struck you about the fact the blood was on top of the shoe and there was no blood on the bottom of the shoe? What conclusions did you draw as an Expert?

8

A.  One of the things we look at and particularly there is a lot of information outside of the fact that it's blood and whose it might come from.  One of the things we might also look at is how did it originate there.  Blood is just, carries a lot of information and how did it, was it wiped on the surface?  Was it cast off of a weapon?  Did it drop there?  Where was it located on an item also can be very important depending on the nature.  If someone steps in blood you know obviously it's going to be on the bottom of a shoe.  But if they're actually actively there when something is going on the blood will be transferred to their clothing items.  Perhaps in a very, very, I guess is coming out may squirt and splash; arterial spirting or if it's coming flying very, very small specks.  We've had cases where someone indicated they weren't anywhere near a crime and they actually had little pen dots of blood underneath the brim of their hat.  Which is going to show that they were actually there when, when the blood was flying around so to speak.  So, by finding blood on top of an item, an actual scene it just indicates that they had to be there when the blood obviously was likely falling on the item and a stain indicating that it was something that was in a liquid form that would actually form a droplet or a stain on the top of the shoe itself.

At trial, the Defendant testified that on July 25, 1991, he was living at his grandfather's house just down the road from the victim's house.  He stated he had not been at the victim's house except for visiting many years before she was killed.  The Defendant testified that on July 25, 1991, he went to Ville Platte with Tim Sylvester and bought a new shirt and a pair of shoes so he could bartend at Sylvester's sister's wedding the next day.  He identified the shoes in evidence as the ones he bought and wore that day and evening.

The Defendant explained that he spent the evening drinking and doing drugs with Chris Morgan.  He stated Morgan took him home around midnight and he spent the rest of the night there.  He denied killing the victim.  The Defendant testified that it was not possible that the victim's blood was on his shoe or that his blood was at the crime scene.

Generally, expert opinion testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact. . . ." La.Code Evid. art. 702. Specifically, La.Code Evid. art. 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused."

The Louisiana Supreme Court in *State v. Deal*, 00-0434 (La. 11/28/01), 802 So.2d 1254, *cert. denied*, 537 U.S. 828, 123 S.Ct. 124 (2002), found the expert's opinion regarding the specific intent for first degree murder to be harmless. The state's forensic pathologist testified that the injuries inflicted upon the infant victim involved the specific intent to kill or inflict great bodily harm. The expert's opinion was couched in a hypothetical that mirrored the defendant's case. The defendant admitted he injured his child; therefore, his specific intent was tantamount to the ultimate issue of his guilt or innocence. The court found the trial court erred, but found the error harmless because the jury could conclude from the defendant's own statements what his intent toward the infant was when he injured it. The court stated:

> Thus, in the absence of Dr. McCormick's opinion concerning the defendant's intent, the jury surely could have found that the defendant acted with specific intent to kill or inflict great bodily harm based on the manner in which the infant's airway was obstructed and that the infant was deliberately "slung" into his crib, causing his head injuries. Dr. McCormick's testimony was merely stating the obvious.

*Id.* at 1264-65.

Similarly, in *State v. Irish*, 00-2086 (La. 1/15/02), 807 So.2d 208, *cert. denied*, 537 U.S. 846, 123 S.Ct. 185 (2002), the Louisiana Supreme Court distinguished an expert opinion from a legal conclusion. The court stated:

The first degree murder statute, La. R.S. 14:30, requires a finding of specific intent and, therefore, a defendant lacking this cannot be found guilty under the statute. Thus, the expert's opinion that the person who shot the victim "intended" to cause immediate death came "exceedingly close to testimony that [in his opinion] the accused was guilty of the crime charged." *State v. Deal*, supra at p. 7, 802 So.2d at 1261 (citing Pugh, *Handbook on Louisiana Evidence Law*, 1998, art. 704, p. 442). However, the testimony about which the present defendant complains was little more than the expert's assessment of the likely medical impact of a gunshot wound to the head, and not a legal assessment of the defendant's state of mind at the time of the shooting or an opinion of his guilt or innocence. Further, unlike *Deal*, the jury in this case had to determine that the defendant was the shooter.

In any event, assuming any error occurred, it was harmless. *See Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ("The inquiry [for purposes of harmless-error analysis] is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.") Regardless of what words the expert chose to use in responding to the prosecutor's question, credit should be given to the common sense and fairmindedness of the jurors who understand that the likely purpose of shooting someone in the head at close range with a high-powered rifle is to cause immediate death. *State v. Green*, 81-2661, 416 So.2d 539, 541 (La.1982) (recognizing "the common sense and fairmindedness of jurors and their ability to distinguish meaningful evidence from unwarranted comments"). The fact that the expert underscored this obvious result in no way prejudiced the defendant. *State v. Deal*, supra (expert's "testimony regarding the defendant's intent was merely stating the obvious"); (emphasis in original); *State v. Sanders*, 93-0001, p. 18 (La. 11/30/94), 648 So.2d 1272, 1286-1287; *State v. Code*, 627 So.2d 1373, 1384-1385 (La.1993). This assignment of error lacks merit.

*Id.* at 212-13.

In this case, Wickenheiser testified that as a forensic expert the evidence supported the scenario that the shoe was at the place of the victim's murder. Wickenheiser also testified that the evidence was overwhelming that those shoes were in that house when the victim was dead. Wickenheiser gave a summarizing opinion

of the evidence before the jury and concluded that the State's theory of the case was the only reasonable explanation. The expert's opinion invaded the province of the jury as fact-finder.

The State argues that the expert testified only about the shoe and its presence at the crime scene and did not state how the presence of the shoe related to the murderer. The State contends that the expert did not testify regarding the ultimate issue in the case. The State cited *State v. Code*, 627 So.2d 1373 (La.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870 (1994), and distinguished it from this case.

In *Code*, the Louisiana Supreme Court found that experts had given improper opinion testimony, but found the error to be harmless. A fingerprint expert testified that he believed the prints left by the defendant on the victim's bathtub were left when he drowned the victim. The court found the expert's testimony "expressly violated the prohibition against expert testimony on an ultimate issue of fact." *Id.* at 1384. Another fingerprint and crime scene investigation expert testified that the bathtub palm prints were matched to the defendant's and had been left by the murderer. The court found this expert's statements implicitly violated the same rule. Finding error, the court conducted a harmless error analysis and stated: "Considering the admissible evidence concerning the palm prints, no rational juror could find those facts without also finding the ultimate fact of the defendant's guilt." *Id.* at 1385.

The State asserts that in the *Code* case an expert stated the palm prints were left at the murder scene by the perpetrator. The State distinguishes this case because, it says, the experts only testified about the shoe's presence at the crime scene and did not specifically relate the shoe to the Defendant. This argument is centered on semantics as the evidence at trial had already established that the shoe in question was the Defendant's. Therefore, the expert's opinion that the shoe was at the murder

scene was tantamount to a pronouncement that the Defendant committed the murder. The expert's opinion testimony was in violation of La.Code Evid. art. 704.

Because the expert opinion invaded the province of the jury by addressing the Defendant's guilt or innocence, a harmless error analysis is necessary. At trial, the physical evidence tying the Defendant to the crime scene was uncontroverted. The Defendant's DNA was found in a blood smear on the panel of the door that was kicked in at the victim's house. The Defendant's shoe contained a blood droplet with the victim's DNA and glass particles similar to the glass found in the broken window of the house.

Additional evidence at trial revealed the Defendant was seen the day after the murder with fresh cuts on his leg. The Defendant testified he had cut his leg on a weedeater at work. The morning after the murder Defendant told a family member that a deputy told him the victim had been shot. Family members testified they were not told the cause of death until hours after Defendant's statement. Chief Detective Speyrer testified that he told his deputies to initially withhold all information on the victim's cause of death.

A forensic scientist testified that the shoeprint on the door panel of the victim's house was similar to the Defendant's shoes. However, she stated that insufficient detail on the print prevented her from making a positive identification match. The Defendant testified that the shoes taken by deputies were a new pair that he had purchased on the day of the murder. He denied committing the murder, and stated he did not know how his blood was found at the scene or how the victim's blood got on his shoes. The Defendant testified that he did not go to the victim's house after the murder.

Given this evidence, a reasonable jury could have concluded that the Defendant was at the scene of the crime. Even without the expert's opinion, the

13

answer to the ultimate issue in the case was obvious and the guilty verdict was unattributable to the erroneous testimony. Therefore, the expert's opinion was harmless error.

### Failure to Conduct a *Daubert* Hearing

The Defendant contends that the trial court erred in allowing DNA evidence at trial without conducting a proper *Daubert*[1] hearing concerning the reliability of the evidence. In its brief to this court, the State argues that the Defendant cannot raise this issue on appeal as the evidence was not objected to at trial. It is true that the trial record is void of any objections to the admissibility of the DNA evidence. In addition, a review of the record reveals that the Defendant did not file a motion requesting that a *Daubert* hearing be held.

Therefore, this issue was not preserved at trial and is not properly before this court. See La.Code Crim.P. art. 841.

### CONCLUSION

For the foregoing reasons, the Defendant's conviction is affirmed.

**AFFIRMED.**

---

[1]The standard of admissibility for determining the reliability of expert scientific evidence is set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189 (1995).