# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 12-615

STATE OF LOUISIANA

VERSUS

BRENDA GAIL RAINS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 09-870
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JIMMIE C. PETERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, James T. Genovese, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**James Patrick Lemoine**
**District Attorney, 35th JDC**
**P. O. Box 309**
**Colfax, LA 71417-0309**
**(318) 627-2971**
**COUNSEL FOR APPELLEE:**
    State of Louisiana

**J. Clay Lejeune**
**Attorney at Law**
**P. O. Box 1919**
**Crowley, LA 70527**

**(337) 788-1505**
**COUNSEL FOR DEFENDANT /APPELLANT:**
   **Brenda Gail Rains**

**PETERS, J.**

The State of Louisiana charged the defendant, Brenda Gail Rains, by grand jury indictment with manslaughter, a violation of La.R.S. 14:31. A jury convicted her of the offense and the trial court sentenced her to serve twenty-five years at hard labor with the first twenty years of the sentence to be served without the benefit of parole, probation, or suspension of sentence. After the trial court rejected her motion for reconsideration of her sentence, the defendant perfected this appeal, asserting seven assignments of error. For the following reasons, we affirm the defendant's conviction and sentence in all respects.

The defendant shot Alvis W. Lewis at her residence in Grant Parish, Louisiana, on the afternoon of June 13, 2009. Mr. Lewis died of his wounds while being transported to a medical facility. On October 6, 2011, a Grant Parish grand jury returned an indictment against the defendant charging her with manslaughter. She entered a not guilty plea to the indictment at her December 11, 2009 arraignment, and requested the appointment of a sanity commission by a motion filed on July 23, 2010. In response to that motion, the trial court appointed a sanity commission pursuant to La.Code Crim.P. art. 644. After a two-day hearing beginning on March 17, 2011, and ending on March 31, 2011, the trial court found the defendant competent to stand trial. The five-day trial on the merits began on July 18, 2011, and ended with the jury returning a verdict of guilty as charged. After rejecting post-trial motions filed by the defendant, the trial court sentenced her on October 6, 2011. Thereafter, the defendant perfected this trial, asserting seven assignments of error:

> 1. The court erred in finding that Dr. Jay [Piland] was qualified as an expert in forensic psychology where he only took [an] eight (8) hour on line course.

2.  The court erred in not ordering additional psychological testing on the [D]efendant prior to the commencement of the trial.

3.  The court erred in failing to suppress the [D]efendant's statement to [Grant Parish Sheriff's Officers] Bullock and Bryant.
4.  The court erred in allowing the State to introduce the Grand Jury testimony of the [D]efendant in its case in chief.

5.  The court erred in not granting the mistrial after the prejudicial statement by the prosecutor.

6.  The court erred in finding that there was sufficient evidence to establish that the [D]efendant possessed the requisite specific intent to kill at the time of the shooting.

7.  The court erred in not deviating from the mandatory minimum sentence as allowed by Louisiana Code of Criminal Procedure Article 893.3.

### Assignment of Error Number Six

We address this assignment of error first because it addresses the sufficiency of the evidence.

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.

*State v. Hearold*, 603 So.2d 731, 734 (La.1992) (footnote omitted).

In this assignment of error, the defendant does not deny that she killed Mr. Lewis, but asserts that the state failed to establish beyond a reasonable doubt that she possessed the requisite specific intent to commit the offense of manslaughter.

In applying the *Jackson* standard we also recognize the following:

2

> A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

The only testimonial evidence presented by the state concerning the shooting of Mr. Lewis was provided by the defendant in two statements she gave to law enforcement personnel on June 13, 2009, and her testimony before the grand jury that indicted her. Certain aspects of her testimony cannot be refuted, while the physical evidence raises questions concerning other aspects.

According to the defendant, she met Mr. Lewis approximately five years before her testimony to the grand jury, and a year after their initial meeting, they began an intimate relationship although they never actually lived together. Soon after their personal relationship developed, the defendant and Mr. Lewis began a trucking business with one broken down dump truck which the defendant's father had given her a number of years before. Initially the business flourished, and the couple invested in two additional trucks. Mr. Lewis maintained employment with another company, and the defendant ran the trucking business. At some point, all of the rolling stock of the business was placed in the victim's name. Additionally, the initial success of the business did not last, and it ceased to be a financial success.

The defendant testified that the June 13, 2009 incident had its origins in an incident on Valentine's Day of that same year. According to the defendant, Mr. Lewis sexually assaulted her on that evening in a very abusive and physically damaging way. While he had been somewhat abusive to her during their relationship, these acts were far beyond what one should expect in a personal and

3

intimate relationship. While the business relationship continued to exist after this day, the personal relationship was so damaged that the defendant became severely depressed and ceased any contact with Mr. Lewis. In fact, according to the defendant, she saw Mr. Lewis only one time between Valentine's Day and June 13, 2009.

The defendant became so depressed after her breakup with Mr. Lewis that she lost interest in almost everything and began to express thoughts of suicide to her family. This resulted in her elderly mother moving in with her for her own protection. According to both the defendant and her mother, all the defendant would do on a daily basis was sleep.

On the afternoon of June 13, 2009, Mr. Lewis appeared unannounced at the defendant's home just as she was waking up. He informed her that he was there to retrieve some paperwork and to remove the license plates from the three dump trucks. The defendant testified that he entered the room she used as a business office, scattered papers around the room, tore through the mail, and broke a chair situated behind her desk. As he was making a mess of the office, Mr. Lewis made a number of crude and derogatory remarks directed toward the defendant and told her he was ending the business relationship.

Mr. Lewis then went outside to where the three trucks were located and removed the license plates. The defendant accompanied him into the yard and begged him to leave the plates on at least one truck because she had the possibility of a job the next week and needed the income. According to the defendant, Mr. Lewis struck her in the chest with the palms of his hands, renewed his derogatory remarks toward her, and continued removing the plates. They then returned inside and continued to argue.

According to the defendant, Mr. Lewis then left the house again and placed the recently removed license plates in his vehicle. When he returned into the house, he took the company checkbook and wrote a $15,000.00 check on the account, but made it payable to the defendant's mother, not the defendant. The defendant testified that Mr. Lewis suggested this amount was for settlement of her share of the company and that he had made the check payable to her mother to assure that the bills would be paid by the funds. According to the defendant, she and the victim had discussed this issue the week before in a telephone conversation, and they had agreed that her share would be $25,000.00 and not $15,000.00. Her understanding concerning the higher settlement amount was based on the value of the truck she had contributed to the business and one-half of the funds in the company account at the time (approximately $17,000.00).

At this point, the defendant retreated to her mother's bedroom and retrieved her mother's .38 revolver. She hid the weapon in her purse and followed the victim outside. In her statements to the investigating officers, her grand jury testimony, and her trial testimony, the defendant asserted that her intent was to shoot herself in Mr. Lewis' presence so that he would understand how much he had hurt her. However, when she told him what she intended to do, Mr. Lewis turned and knocked the weapon from her hand, and it fell to the ground. As she reached on the ground to retrieve the pistol, Mr. Lewis started to walk away from her and she heard him say in a very vulgar way that she did not have it in her to commit suicide.

According to the defendant in both her grand jury testimony and her trial testimony, as she pulled the pistol up to shoot herself in the chest, it discharged striking Mr. Lewis in the back. She clearly recalled in her grand jury and trial

testimony that the weapon had been cocked from the time she left the house. After the weapon discharged, she immediately ran to the house and attempted to call 911.

The state introduced the recorded 911 call into evidence. In that recording, the defendant is heard informing the recipient of the call that "[m]y partner was here[,] and he started hitting me[,] and the gun went off." Later in the telephone call, she stated that "[h]e was struggling with me over the gun."

Grant Parish Sheriff's Deputies Jason A. Chellette and Dale Whitstine were the first officers to respond to the 911 call on June 13, 2009. They arrived within minutes after the 3:41 p.m. call, and the defendant was first approached by Deputy Chellette. He observed that she was in an emotional state, and when she attempted to tell him about an argument between her and the victim whom he could see lying on the ground, he immediately told her to stop talking and read her the rights required pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). According to Deputy Chellette, the defendant seemed to understand her rights as explained to her. Still, he did not interrogate her, and instead, after he performed a pat down search for officer safety and attempted to inquire concerning her need for medical attention, the defendant blurted out that "I don't want the blame for this."

Deputy Chellette placed the defendant in the back of his patrol car. Detective Rufus Jones arrived while the defendant was still in the backseat of the patrol car, and after speaking with Deputy Chellette, entered the patrol unit with the defendant and attempted to interrogate her. He again explained her *Miranda* rights and had her sign a printed rights waiver form. The statement given to Detective Jones was similar to the defendant's testimony before the grand jury except that in her statement, she suggested that the weapon discharged during a struggle and not after Mr. Lewis had begun walking away, and that she could not remember whether or not the weapon was cocked at the time it discharged. At

6

approximately 5:15 p.m., Detective Jones transported the defendant to the Grant Parish Sheriff's Office in Colfax, Louisiana.

Grant Parish Sheriff's Office Detective Jody Bullock arrived back at the Sheriff's Office at approximately 8:30 p.m., and he and Deputy Donna Bryant continued the interrogation of the defendant. Detective Bullock again explained the defendant's *Miranda* rights to her and had her confirm that she had signed the printed rights waiver form for Deputy Chellette and that she had not changed her mind. While she stated that she was not sure what to do, she voluntarily spoke with Detective Bullock with Deputy Bryant present. As was the case with her statement to Detective Jones, the defendant's statement to Detective Bullock was similar to her testimony before the grand jury except for how the actual shooting occurred, and whether the weapon was cocked. In this statement, she suggested that the weapon had discharged as he turned away from the struggle. At one point in the interview, she stated a lack of memory concerning whether the weapon was cocked, and at another point, she stated that it was cocked.

After completing the statement, Detective Bullock arrested the defendant for the offense of manslaughter. Up until this time, she had not been formally charged with any offense.

The investigating officers obtained a search warrant and searched the defendant's home on the afternoon of June 13, 2009. Despite the defendant's description of the office and the damage therein, Detective Bullock testified that the office and the chair therein did not appear to be damaged.

Dr. Susan Garcia, a medical doctor and forensic pathologist employed with the Jefferson Parish Forensic Center in Harvey, Louisiana, performed an autopsy on Mr. Lewis and concluded that his death was caused by the gunshot wound inflicted on him by the defendant. She found the entry wound to have been located

7

ten inches from the top of his shoulder and one inch to the left of his midline. Given his height, the entry wound would have been approximately fifty-one to fifty-three inches from the ground assuming he was standing straight up at the time of the impact. The projectile struck Mr. Lewis at an almost horizontal angle.

Richard Beighley, a criminalist with the North Louisiana Criminalistics Laboratory in Shreveport, Louisiana, examined a number of items seized by the law enforcement officers during their investigation. Given his examination of the .38 caliber revolver that killed Mr. Lewis and the clothes Mr. Lewis was wearing at the time of the shooting, Mr. Beighley concluded that there was nothing unduly light about the trigger pull on the weapon and that the weapon had been fired within two to four feet muzzle to target.

On appeal, the defendant's sole focus is on La.R.S. 14:31(A)(1) which defines manslaughter as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

The defendant correctly points out that, if charged under this provision of the manslaughter statute, the state would have to establish that she had a specific intent to commit the offense, that she "actively desired the prescribed consequences to follow [her] act or failure to act." La.R.S. 14:10(1).

In making this argument, the defendant ignores the additional ways by which the offense of manslaughter might be committed. Specifically, manslaughter is also defined as:

> A homicide committed, without any intent to cause death or great bodily harm.

8

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or

(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.

La.R.S. 14:31(A)(2).

Thus, under certain circumstances, specific intent to kill is not an element of the offense of manslaughter.

In this case, the grand jury indictment did not specify the manner wherein the defendant was charged with committing the offense of manslaughter. It simply stated that "she did on June 13th, 2009[,] commit manslaughter of Alvis W. Lewis in violation of Louisiana Revised Statute 14:31." However, in instructing the jury, the trial court stated that, assuming that the evidence established proof beyond a reasonable doubt, the jury could convict the defendant under La.R.S. 14:31(A)(1), (A)(2)(a), or (A)(2)(b).

Concerning the application of La.R.S. 14:31(A)(2)(a), the trial court instructed the jury that if it determined the defendant discharged the firearm in an "intentional or criminally negligent" manner "where it was foreseeable that [her act of discharging the firearm] may result in death or great bodily harm to a human being," that act would constitute the felony offense of illegal use of a weapon. *See* La.R.S. 14:94. Such a finding would establish that Mr. Lewis' death resulted while the defendant was "engaged in the perpetration or attempted perpetration of [a] felony not enumerated in Article 30 or Article 30.1." La.R.S. 14:31(A)(2)(a).

The trial court also instructed the jury that if it found that the defendant was engaged in either assault or aggravated assault when the firearm discharged, this finding would satisfy the element of proof that she was engaged in "any intentional

misdemeanor directly affecting the person." *Id.* An assault is "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La.R.S. 14:36. Louisiana Revised Statutes 14:33 defines a battery as it applies in this case as "the intentional use of force or violence upon the person of another." An aggravated assault is defined as "an assault committed with a dangerous weapon." La.R.S. 14:37.

Given the defendant's testimony concerning the sexual attack she suffered at the hands of Mr. Lewis; her state of depression on June 13, 2009; the personal insults she suffered at the hands of Mr. Lewis concerning her looks, intelligence, and sexual ability; her desperation concerning the loss of the business; her disappointment concerning Mr. Lewis' attempt to settle their business dispute with an amount less than what they had agreed to; and the physical facts of the shooting itself, we find that a rational trier of fact could have found the elements of La.R.S. 14:31(A)(1) proven beyond a reasonable doubt. Additionally, given the record as a whole, we also find that a rational trier of fact could have found the elements of either La.R.S. 14:31(A)(2)(a) or La.R.S. 14:31(A)(2)(b) proven beyond a reasonable doubt. We find no merit in this assignment of error.

### *Assignment of Error Number One*

The trial court appointed Dr. Jay L. Piland, an Alexandria, Louisiana internal medicine physician, and Dr. Kenneth Brinn, an Alexandria, Louisiana clinical psychologist, to serve on the sanity commission. In this assignment of error, the defendant asserts that the trial court erred in finding that Dr. Piland was qualified to serve as a member of that sanity commission.

Concerning the qualifications to serve on a sanity commission, La.Code Crim.P. art. 644(A) provides in pertinent part:

> The sanity commission shall consist of at least two and not more than three members who are licensed to practice medicine in Louisiana, who have been in the actual practice of medicine for not less than three consecutive years immediately preceding the appointment, and who are qualified by training or experience in forensic evaluations. The court may appoint, in lieu of one physician, a clinical psychologist or medical psychologist who is licensed to practice psychology in Louisiana, who has been engaged in the practice of clinical or counseling psychology for not less three consecutive years immediately preceding the appointment, and who is qualified by training or experience in forensic evaluations. Every sanity commission shall have at least one psychiatrist as a member of the commission, unless one is not reasonably available, in which case, the commission shall have at least one clinical psychologist as a member of the commission.

The defendant questions whether Dr. Piland is "qualified by training or experience in forensic evaluations." Specifically, the defendant asserts that Dr. Piland's expertise in that field was based on one eight-hour online computer course.

The record reflects that Dr. Piland is board certified in internal medicine. He practiced in Alexandria, Louisiana, since 1997, and served the trial courts on numerous occasions by completing competency evaluations on individuals in litigation. While this was the first time Dr. Piland was appointed to a sanity commission, he served from 2001 through 2006 as the Medical Director for all medical evaluations performed at Crossroads Hospital, a Rapides Parish mental treatment facility. In his position as Medical Director, he oversaw all physical examinations of psychiatric patients at the facility, and this physical assessment would be in combination with the psychiatrist assigned to the patient. This position caused him to be exposed to 100 to 150 admissions per month over a period of five years.

Notwithstanding the defendant's assertion to the contrary, the trial court did not limit its evaluation of Dr. Piland's qualifications to the eight-hour online seminar. Instead, the trial court considered the doctor's overall experience with special emphasis on the record at Crossroads Hospital. While the legislature has

11

amended La.Code Crim.P. art. 644 a number of times since 1974 to modify the particulars of the appointive process, the long-standing rule set forth in *State v. Vince*, 305 So.2d 916, 919 (La.1974), that "[s]election of physicians to serve on a sanity commission rests within sound discretion of the trial judge" still remains.

We find no abuse of discretion in the trial court's appointment of Dr. Piland as a member of the sanity commission in this case. Thus, we find no merit in this assignment of error.

### *Assignment of Error Number Two*

Other than to question Dr. Piland's qualifications to serve on the sanity commission, the defendant does not challenge the trial court's conclusion after the sanity commission hearing that the defendant was competent to proceed to trial. Instead, in this assignment of error, the defendant argues that the trial court erred in not ordering additional psychological testing immediately prior to trial to determine whether or not the defendant's condition had deteriorated since the March 2012 sanity hearing. Specifically, the defendant asserts that based on the evidence presented at the sanity hearing, there was a substantial risk her emotional state would deteriorate during trial and that the trial court was required to make a second determination at trial to evaluate whether she was competent to proceed to trial.

Dr. Piland opined that the defendant knew right from wrong at the time of the offense and that she was capable of assisting her counsel in going forward with the criminal proceedings. With regard to the possibility of the defendant's condition deteriorating before trial, Dr. Piland acknowledged that during his interview the defendant manifested symptoms of anxiety, and to a mild degree, a panic attack. However, he also testified that anxiety could be controlled with medication and that since the offense, she had been prescribed a mood stabilizer in

combination with anti-psychotics that would allow her to control potential episodes of deterioration. However, he also testified that even if the defendant were to suffer a panic attack, the extent of that condition would not impair her cognitively to the point that she would be unable to formulate thoughts.

Dr. Binns also testified that the defendant knew right from wrong at the time of the offense, understood the charges against her, and could assist her counsel in going forward in the criminal proceedings. However, he was also of the opinion that the defendant's condition could deteriorate rapidly under stress and that if it did, she would have difficulty making rational decisions. He was also of the opinion that, with a good support system, the defendant could progress through trial without difficulty.

Dr. James Harrold, a Shreveport, Louisiana psychiatrist testified at the sanity commission on behalf of the defendant. He had become her treating physician in July of 2010 when the defendant entered Brentwood Hospital in Shreveport, Louisiana, as an inpatient. Dr. Harrold testified that when he treated the defendant in July of 2010, she was suffering from bipolar mood swings with some psychotic symptomatology and paranoia and was having difficulty with reference in general. Based on his findings at that time, Dr. Harrold questioned whether the defendant could assist her counsel in her defense based on her inability for clarity of thought, poor reality testing, and racing and intrusive thoughts. However, Dr. Harrold also testified at the sanity commission hearing that because he had not seen the defendant since her discharge from Brentwood Hospital, he was unable to render an opinion concerning her condition at the time of the hearing.

In finding the defendant competent to stand trial, the trial court recognized that all three experts who testified at the sanity hearing expressed concerns that the defendant's condition might become worse in the future, depending on the stress to

13

which she might be exposed and the support she had in going through the ordeal of trial. However, the trial court correctly recognized that a criminal prosecution could not be stopped based on what might occur in the future and that its decision of the moment was to consider the defendant's current condition.

The defendant asserts that the trial court's error is evidenced by the supreme court's ruling in *State v. Clark*, 367 So.2d 311 (La.1979). In *Clark*, the defendant sought relief from the trial court's denial of his motion to appoint a sanity commission prior to trial and his motion for a new trial which reurged the objection of mental incapacity to proceed. The supreme court found no error in the trial court's refusal to appoint a commission before trial because there was not a showing of "reasonable ground to doubt the defendant's mental capacity to proceed" as required by La.Code Crim.P. art. 643. The supreme court did find, however, that the evidence established reasonable grounds to question whether the defendant could proceed to sentencing after his conviction. Thus, the supreme court affirmed the defendant's conviction, but vacated the sentence and remanded the matter to the trial court for appointment of a sanity commission at that point in the proceedings.

We find that the holding in *Clark* is distinguishable from the matter now before us. Although there was evidence presented at the sanity hearing that the defendant's condition *might* change for the worse before trial, there is no evidence that it did. Thus, unlike in *Clark*, the defendant did not file a motion with the trial court asserting that her condition had in fact deteriorated to the point that she could not assist in her defense. We know of no rule of law that requires the trial court, on its own motion and without any evidence to suggest that a defendant's mental condition has changed, to require an additional mental evaluation before trial.

We find no merit in this assignment of error.

14

## *Assignment of Error Number Three*

Immediately before trial began on the first day of trial, the defendant filed a motion to suppress her statement given to Detective Bullock in the presence of Detective Bryant. After a hearing, the trial court rejected this motion and the matter went to trial. In this assignment of error, the defendant asserts that the trial court erred in failing to suppress that statement.

At the hearing on the motion, Detective Bullock testified that when he first met with the defendant at the Grant Parish Sheriff's Office, she was visibly upset. Before starting the interview, he again provided her with her *Miranda* warnings and provided her with the printed waiver of rights form she had signed for Detective Jones. She confirmed her signature on the form and appeared to understand the significance of the form. The defendant waived her rights, and the interview continued. According to Detective Bullock, nothing in the interview suggested to him that any statements by the defendant were not free and voluntary.

In denying the defendant's motion to suppress the statement, the trial court stated:

> I agree that the state has heavy burden of proving that the statement was voluntary, knowingly, and intelligently given. I agree with you that I don't think that a reasonable person would, in Ms. Rains' position, would believe that they could have walked out of the detective's office on their own accord. But, I have no doubt that Ms. Rains was advised of her rights on several occasions. There's been nothing presented today to indicate that she was not advised of her rights. To the contrary, it appears that she was advised of her rights at least on the scene by the execution of a rights waiver form which was introduced as S-2. Detective Bullock indicated that, prior to his beginning of questioning Ms. Rains in his office, he advised her of her rights by his card and also reviewed the previously executed waiver of rights which he believed Ms. Rains had signed. By his testimony, she acknowledged what the form was and recalled waiving her rights. Based on the testimony that we have thus far, Ms. Rains was upset, she indicated that she was concerned about going to jail, and she made a statement that she did not know what to do. Not knowing what to do could relate to a lot of different things in that situation. Mr. Bullock indicated that in direct response to that statement, he

15

reminded her that she did not have to talk to him. There are things that indicate to me that Ms. Rains understood and knew what she was doing. She asked for permission to smoke a cigarette, and that was granted. She asked Detective Bullock not to record the statement, that was done. Had a significant amount of time passed from the accident to when this was given, I think it's quite likely that this questioning occurred around 9:30 at night. If you compare the forms we have with when she was booked in to the detention center, I think that that is likely. But, I don't think any of those factors indicate that she didn't understand what she was doing, that she didn't know that she could not assert her right to remain silent. There's nothing to indicate that she was unaware that she could request counsel. To the contrary, it appears that while obviously upset, I think anyone would be upset in that situation, she elected to tell them what happened.

In *State v. Blank*, 04-204, pp. 9-10 (La. 4/11/07), 955 So.2d 90, 103, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494 (2007), the supreme court stated:

Before the state may introduce a confession into evidence, it must demonstrate that the statement was free and voluntary and not the product of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451; La.C.Cr.P. art. 703(D); *State v. Simmons*, 443 So.2d 512, 515 (La.1983). If a statement is a product of custodial interrogation, the state additionally must show that the person was advised before questioning of his right to remain silent; that any statement he makes may be used against him; and, that he has a right to counsel, either retained or appointed. *Miranda v. Arizona*, *supra*. When claims of police misconduct are raised, the state must specifically rebut the allegations. *State v. Vessell*, 450 So.2d 938, 942-943 (La.1984). A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless not supported by the evidence. *State v. Benoit*, 440 So.2d 129, 131 (La.1983); *State v. English*, 582 So.2d 1358, 1364 (La.App. 2nd Cir.1991), *writ denied*, 584 So.2d 1172 (La.1991). Credibility determinations lie within the sound discretion of the trial court and its rulings will not be disturbed unless clearly contrary to the evidence. *Vessell, supra* at 943. When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances under which it is made, and any inducement is merely one factor in the analysis. *State v. Lavalais*, 95-0320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053; *State v. Lewis*, 539 So.2d 1199, 1205 (La.1989); *State v. Thomas,* 461 So.2d 1253 (La.App. 1st Cir.1984), *writ denied*, 464 So.2d 1375 (La.1985).

Considering the record before this court, we find no error in the trial court's denial of the defendant's motion to suppress her statement given to Detective Bullock. We find no merit in this assignment of error.

16

### *Assignment of Error Number Four*

The defendant asserts in this assignment of error that the trial court erred by allowing the state to introduce her grand jury testimony absent clear evidence that she waived her *Miranda* rights prior to testifying before that body. Absent such a waiver, the defendant argues, her statement was not freely and voluntarily given and should be stricken.

In support of its position that the grand jury testimony was admissible, the state directs this court to the supreme court's holding in *State v. Poland*, 00-453 (La. 3/16/01) 782 So.2d 556. In that case, the trial court allowed the state to introduce the defendant's grand jury testimony in its case-in-chief at trial on the basis that the grand jury proceeding was not a custodial interrogation, that the defendant's counsel was present, and that the defendant voluntarily testified. The issue before the supreme court in *Poland* was whether the use of such testimony violated the principles of grand jury secrecy contained on La.Code Crim.P. arts. 433 and 434, when the person, represented by counsel, knowingly and intelligently waived the right against self-incrimination in the proceeding. In concluding that the trial court properly admitted the evidence, the supreme court reasoned:

> The foregoing considerations for the legislative mandate of secrecy clearly are designed primarily for a non-target witness and are not significant when a target of the investigation voluntarily testifies before the grand jury with counsel present. *See* 2 *Wharton's Criminal Evidence* § 344 (12th ed. 1955). Not one of these reasons for maintaining the secrecy of grand jury proceedings is applicable in the present case. At the time that defendant testified before the grand jury, he had already been arrested for murder and had been identified as the target of the grand jury investigation. And because he was subsequently indicted, one could hardly say that the use of his testimony would besmirch his good name or subject him to ridicule.
>
> Moreover, the use of the testimony of a person already arrested for the crime would hardly discourage prospective witnesses from coming before the grand jury for fear that those against whom they testify would be aware of that testimony; the use of such testimony would not make other witnesses less likely to testify fully because of

17

possible retribution or inducement;  and the use of such testimony would not create the risk that a person about to be indicted would flee or would attempt to influence individual grand jurors to vote against indictment.

Perhaps more significantly, this defendant, already facing criminal charges, knowingly and voluntarily, and in the presence of his attorney, waived his right to remain silent and his right not to incriminate himself.  A person has a constitutional right not to give evidence against himself or be a witness against himself.  U.S. Const. Amend. V, cl. 3; La. Const. art. I, § 16.  However, that right can be waived if done knowingly and voluntarily.  A person also has a statutory right to have his testimony before a grand jury held in secrecy, but there is no apparent reason why that right cannot also be waived, unless the rights of others are affected or the integrity of grand jury proceedings is undermined.

Here, defendant, while under criminal charges, knowingly and voluntarily waived his right to remain silent and not to incriminate himself.  Knowing he was the target of the investigation, he told the grand jury, without compulsion and with his attorney present, his version of the occurrence.  Defendant took his chances of persuading the grand jury not to indict him, and he lost.  Exclusion of the testimony that defendant intended to be exculpatory would serve absolutely no purpose associated with the secrecy of grand jury testimony or with the fairness of criminal proceedings.

*Id.* at 560-61.

 As pointed out by the defendant in the matter before us, the defendant in *Poland* had been read his *Miranda* rights prior to testifying and had knowingly and intelligently waived those rights.  In the matter now before us, there is no evidence that the defendant was provided with such protection prior to her testifying.  The record does reflect, however, that the defendant's counsel stated to the trial court in argument that he had talked to her about testifying before the grand jury as part of his plan to convince the grand jury that the proper charge would be manslaughter and not second degree murder.

In rejecting the defendant's argument, the trial court found it significant that the defendant had not been subpoenaed to testify and that she desired to explain her version of what happened to the grand jury.  As such, the court found that her

18

statements to the grand jury made under oath in the presence of her attorney were knowingly and voluntarily given.

Similar to the defendant in *Poland*, the defendant in the matter before us was the target of the grand jury investigation and voluntarily testified before the grand jury with counsel present. That being the case, the reason for maintaining the secrecy of grand jury proceedings is not applicable herein. Also, at the time she testified before the grand jury, the defendant had already been arrested and was trying to impress the grand jury not to indict her for second degree murder. She was subsequently indicted for the lesser offense of manslaughter. That being the case, the use of the defendant's testimony would not likely tarnish her good name or subject her to ridicule or discourage prospective witnesses. Moreover, the defendant did not assert that the use of her grand jury testimony affected the rights of anyone else or undermined the integrity of the grand jury. The defendant chose to take a chance and was successful at persuading the grand jury to indict her for a lesser offense, thereby avoiding the possibility of a life sentence. Finally, unlike the defendant in *Poland* who later invoked his right to remain silent and did not testify at trial, the defendant herein testified at her subsequent trial.

We find no error in the trial court allowing the admission of the defendant's grand jury testimony into evidence. We find no merit in this assignment of error.

### *Assignment of Error Number Five*

While cross examining the defendant's mother, counsel for the state questioned her concerning her knowledge of the defendant's prior arrest history. In response, the defendant's counsel objected and requested a mistrial. The trial court basically sustained the objection, but concluded that an admonishment to the jury, not a mistrial, was the appropriate response. In this assignment of error, the defendant asserts that the trial court erred in not granting the mistrial.

19

The exchange between the state and Barbara Rains was actually a response to questions raised by the defendant's counsel on direct. The defendant's counsel asked Mrs. Raines if she had any reason to doubt what the defendant had told her concerning the shooting, i.e., that it was an accident and that she was trying to take her own life at the time. When Mrs. Rains responded "[n]o," the defendant's counsel asked her why she had no reason to doubt the defendant's story. Mrs. Rains responded to that question by stating: "Because she's no liar. She's not no thief[,] and everybody that knows her knows she's not. She's a good person[,] and everybody that knows her likes her."

On cross examination, the state asked Mrs. Rains some general questions concerning her response to the defendant's question, and after allowing Mrs. Rains to restate her position that her daughter is a "[v]ery good" person, followed up those general questions with this exchange:

Q     And, you've known what kind of problems she's gotten into and what kind of - -

A     Yes. I know of that.

Q     Okay.

A     Very well.

Q     Do you know any type of problems she's gotten into in the past that are kind-of like this?

A     No, I don't.

Q     Has she ever been arrested for anything, for example?

A     Yes, she has.

Q     She has?

A     Yes.

Q     A similar type - -

A     Well, her and her sister getting into it over the kids was one deal.

Q     And, involving weapons, right?

A     No. And weapons? It wasn't no weapons.

At this point the defendant entered her objection and asked for a mistrial based on a pretrial understanding that the defendant's prior arrest history would be excluded from evidence.

The state responded that the pretrial ruling applied *unless* the defendant presented character evidence opening the door for the state to question any witness concerning his or her full knowledge of the defendant's character. By asking Mrs. Rains questions concerning the defendant's character traits, the state argued, the defendant placed her character at issue and opened the door for the state to question Mrs. Rains concerning the defendant's history of violence.

The defendant asserts to this court, as she did in argument to the trial court, that her mother was called as a fact witness and the questions and her responses did not allow the state to expand her testimony to the defendant's prior criminal history. Even if the testimony was to be considered character evidence, the defendant maintains that the character trait at issue was truthfulness and not propensity for violence. The defendant asserts that the state's question concerning the defendant's arrest history painted her as a violent person with a history of using weapons.

The trial court did not grant the mistrial, but admonished the jury to not consider the questions or answers concerning the defendant's prior arrest.

> Evidence of other crimes is generally inadmissible in the guilt phase of a criminal trial unless the probative value of the evidence outweighs its prejudicial effect and unless other safeguards are met. *State v. Code*, 627 So.2d [94-1379 La. 10] 1373 (La.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); *State v. Bourque*, 622 So.2d 198 (La.1993); *State v. Silguero*, 608 So.2d

21

627 (La.1992). This general rule ensures that a defendant who has committed other crimes will not be convicted of a present offense simply because he is perceived as a "bad person," irrespective of the evidence of his guilt or innocence. A conviction should be based on guilt and not on character. *Bourque*, 622 So.2d at 233; *State v. Hamilton*, 478 So.2d 123 (La.1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). One important safeguard is advance notice that such other crimes evidence will be offered. This prevents surprise and allows a defendant an opportunity to prepare a meaningful defense. *Bourque*, 622 So.2d at 233; *Hamilton*, 478 So.2d at 129; *State v. Prieur*, 277 So.2d 126 (La.1973).

There are statutory and jurisprudential exceptions to this exclusionary rule. *Code*, 627 So.2d at 1381; *Silguero*, 608 So.2d at 629. In this case, the state relied upon La.C.E. art. 609.1, which allows impeachment of a witness in a criminal case by evidence of prior convictions. If a defendant chooses to testify, this provision authorizes credibility testing with evidence of prior criminal convictions. *See State v. Tassin*, 536 So.2d 402 (La.1988), *cert. denied*, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989); *State v. Neslo*, 433 So.2d 73 (La.1983) (both decided under former LSA-R.S. 15:495). Evidence regarding previous arrests, indictments, prosecutions or other criminal proceedings not resulting in convictions is prohibited.

*State v. Johnson*, 94-1379, pp. 9-10, (La. 11/27/95), 664 So.2d 94, 99 (footnote omitted).

Thus, the supreme court in *Johnson* held that, while evidence of other crimes may be admissible under certain circumstances in a criminal prosecution, evidence of a prior arrest may not be introduced under any circumstances. The holding in *Johnson* also identified the attempt to introduce other crimes evidence as a trial error.

In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), a five-person majority of the United States Supreme Court distinguished between "trial errors, which may be reviewed for harmless error, and "structural errors," which defy analysis by harmless error standards.

Trial error occurs during the presentation of the case to the trier of fact and may be quantitatively assessed in the context of the other evidence to determine whether its admission at trial is harmless beyond a reasonable doubt. A structural error is one which affects the framework within which the trial proceeds. *Id.*, 499 U.S. at 307-311, 111 S.Ct. at 1264-1265. Structural defects include the complete denial of counsel, *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct.

792, 9 L.Ed.2d 799 (1963); adjudication by a biased judge, *see Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); exclusion of members of defendant's race from a grand jury, *see Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); the right to self-representation at trial, *see McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); the right to a public trial, *see Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); and the right to a jury verdict of guilt beyond a reasonable doubt, *see Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). This Court has acknowledged the distinction between trial error and structural error. *See State v. Cage*, 583 So.2d 1125 (La.1991), *cert. denied*, 502 U.S. 874, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991).

Analysis of the foregoing principles shows that the erroneous introduction of other crimes' evidence is a trial error, i.e., an error which occurs during the case's presentation to the trier of fact, which may be quantitatively assessed in the context of the other evidence. As such, it may be reviewed for harmless error.

*Id.* at 101.

In considering whether the reference to the defendant's prior arrest history is harmless error, we must be mindful of La.Code Crim.P. art. 921 which states that "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, inrregularity, or variance which does not affect substantial rights of the accused." The supreme court in *Johnson* suggested that the test is to determine "whether the verdict actually rendered was surely unattributable to the error." *Johnson*, 664 So.2d at 102. Reviewing the record in this matter, we find that the error was harmless and that an admonition to the jury was sufficient.

We find no merit in this assignment of error.

### *Assignment of Error Number Seven*

Prior to the beginning of trial, the state filed a written notice that in the event of the defendant's conviction, it intended to seek enhancement of her sentence pursuant to La.Code Crim.P. art. 893.3, and the trial court ultimately enhanced the defendant's sentence pursuant to that article. In this assignment of error, the

23

defendant asserts that the trial court erred in not deviating downward from that enhancement provision.

Louisiana Revised Statutes 14:31(B) provides in pertinent part that "[w]hoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." However, La.Code Crim.P. art 893.3(E)(1)(a) provides that if a defendant discharges a firearm while committing a felony listed in La.Code Crim.P. art. 893.3(E)(1)(b), "the court *shall* impose a minimum term of imprisonment of twenty years" (emphasis added). Manslaughter is one of the felonies listed in La.Code Crim.P. art. 893.3(E)(1)(b). Additionally, La.Code Crim.P. art. 893.3(E)(2) provides that "[a] sentence imposed under this Paragraph *shall* be without benefit of parole, probation or suspension of sentence" (emphasis added).

The trial court sentenced the defendant to serve twenty-five years at hard labor with twenty of the twenty-five years to be served without the benefit of parole, probation, or suspension of sentence. In sentencing the defendant, the trial court noted that the sentence imposed exceeded the mandatory minimum of La.Code Crim.P. art. 893.3(E)(1)(b) by five years, but was significantly less than the forty-year maximum that could have been imposed. The trial court found the sentence appropriate considering the facts before it.

While acknowledging that the sentence imposed falls within the range of sentences that may be imposed under La.R.S. 14:31 and La.Code Crim.P. art. 893.3(E), the defendant seeks relief under La.Code Crim.P. art. 893.3(H) which provides that "[i]f the court finds that a sentence imposed under provisions of this Article would be excessive, the court shall state for the record the reasons for such finding and shall impose the most severe sentence which is not excessive." Although the defendant did not specifically call on the court to consider Article 893.3(H) at the hearing or in her motion, a general allegation of constitutional

24

excessiveness in sentencing suffices to preserve this claim for appeal. *State v. Mims*, 619 So. 2d 1059 (La.1993).

As outlined in *State v. Fontenot*, 09-1044, p. 4 (La.App. 3 Cir. 5/12/10), 38 So.3d 1122, *writ denied*, 10-1758 (La. 8/19/11), 67 So.3d 1257, this court's role in evaluating the fairness of sentencing is as follows:

> The Eighth Amendment to the United States Constitution and La.Const. art. 1, § 20 prohibit the imposition of cruel or excessive punishment, and the law is well settled with regard to what constitutes cruel or excessive punishment. An excessive sentence is a penalty that is so grossly disproportionate to the severity of the crime that it shocks our sense of justice or it makes no measurable contribution to acceptable penal goals and, therefore, is nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). Additionally, the trial court is given wide discretion in imposing a sentence, and, absent a manifest abuse of that discretion, the reviewing court should not deem as excessive a sentence imposed within statutory limits. *State v. Howard*, 414 So.2d 1210 (La.1982); *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713. Still, a sentence that falls within the statutory limits may be excessive under the particular circumstances of a given case. *State v. Sepulvado*, 367 So.2d 762 (La.1979). Additionally, "[m]aximum sentences are reserved for the most serious violations and the worst offenders." *State v. Farhood*, 02-490, p. 11 (La.App. 5 Cir. 3/25/03), 844 So.2d 217, 225. The only relevant question for the reviewing court to consider is not whether another sentence would be more appropriate, but rather whether the trial court abused its broad discretion in sentencing a defendant. *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996).

In the defendant's motion to reconsider sentence, she asked that the trial court reconsider her sentence on the grounds that it was excessive in light of the facts and circumstances surrounding the conviction. At the hearing on the motion, the defendant re-urged the trial court to impose a lesser sentence based on the mitigating factors presented at sentencing.

The trial court in this case imposed the minimum sentence required by law, plus five additional years in which the possibility of parole or probation would be available to the defendant. As the trial court has broad discretion in sentencing, we find that no abuse of that discretion occurred.

25

## DISPOSITION

For the foregoing reasons, we affirm the defendant's conviction and sentence in all respects.

**AFFIRMED.**